**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| CITY OF HOLLYWOOD POLICE OFFICERS' RETIREMENT SYSTEM, Individually, and on Behalf of All Others Similarly Situated, | Case No. _____ |
| Plaintiff, | |
| v. | |
| THE KRAFT HEINZ COMPANY, 3G CAPITAL PARTNERS, 3G CAPITAL, INC., 3G GLOBAL FOOD HOLDINGS, L.P., 3G GLOBAL FOOD HOLDINGS GP LP, 3G CAPITAL PARTNERS LP, 3G CAPITAL PARTNERS II LP, 3G CAPITAL PARTNERS LTD., BERNARDO HEES, PAULO BASILIO, and ALEXANDRE BEHRING, | |
| Defendants. | |

**CLASS ACTION COMPLAINT**

Plaintiff the City of Hollywood Police Officers' Retirement System, individually and on behalf of a class of similarly situated persons and entities, by its undersigned attorneys, brings this Action pursuant to Sections 10(b), 20(a), and 20A of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder. Plaintiff brings this class action on behalf of itself and all other persons or entities who purchased or otherwise acquired securities of the Kraft Heinz Company ("Kraft Heinz" or the "Company") during the period from July 2, 2015 to November 4, 2015, inclusive (the "Class Period") and were damaged thereby (the "Class"). The Defendants in this Action are Kraft Heinz, 3G Capital Partners and its affiliated funds ("3G Capital" defined further below), and the Individual Defendants (defined *infra* ¶28).

Plaintiff alleges the following upon information and belief, except as to allegations concerning themselves and their own acts. Plaintiff's information and beliefs are based upon its counsel's investigation, which included the review and analysis of, among other things: (i) transcripts, press releases, news articles, and other public statements issued by or concerning Kraft Heinz, 3G Capital, and the Individual Defendants; (ii) research reports issued by financial analysts concerning the Company; (iii) reports filed publicly by Kraft Heinz with the U.S. Securities and Exchange Commission ("SEC"); (iv) the complaint filed in the putative class action, *Union Asset Management Holding AG, et al. v. The Kraft Heinz Company, et al.*, Case No. 1:19-cv-01399-RMD; and (v) other publicly available information. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth in this Complaint after a reasonable opportunity for discovery.

## I. PRELIMINARY STATEMENT

1. This securities class action arises from Defendants' materially false and misleading statements and omissions concerning the most important question investors had for Kraft Heinz's

executives: whether the Company's cost-cutting initiatives planned for and immediately following the 2015 acquisition of Kraft Foods Group, Inc. ("Kraft") by The H.J. Heinz Company ("Heinz") (the "Merger") were "sustainable," *i.e.*, would Kraft Heinz be able to achieve the outsized savings it repeatedly touted prior to and in the months following the Merger solely by eliminating waste and redundancy, and would the Company invest those savings to further brand growth and long-term value?  Defendants assured investors that the answer to that question was "yes."

2.      Accordingly, investors were stunned when, in February 2019, Kraft Heinz announced a historic ***$15.4 billion*** write-down in the value of the Company's Oscar Mayer and Kraft trademarks and other intangible assets.  Beginning immediately following the Merger, when Defendants first implemented their plans to employ extreme and indiscriminate cost-cutting to the Company's supply chain and brand investment, the Individual Defendants debased the value of the Company's historic brands by as much as 50%.  The Company then announced investigations by the SEC and Department of Justice ("DOJ") into Kraft Heinz's accounting and procurement practices, restated years of financial statements due to widespread misconduct in its procurement division, and fired Chief Executive Officer ("CEO") Defendant Bernardo Hees ("Hees"), Chief Financial Officer ("CFO") David Knopf ("Knopf"), and several other high-ranking Kraft Heinz executives.

3.      In August 2019, Hees' successor, Miguel Patricio, finally admitted to investors that, because of practices first implemented immediately following the Merger and unbeknownst to the market, Kraft Heinz had been suffering from ***double-digit*** losses in its global supply chain.  Notwithstanding Hees' and other executives' reassuring statements made in connection with the Merger and its immediate aftermath, and lasting until February 2019, that Kraft Heinz would vigorously focus on organic growth (as opposed to growth through acquisitions), Patricio admitted

that the Company would have to undergo a "fundamental change" in order to finally "pursue organic growth." As these facts emerged, Kraft Heinz's stock declined, wiping out billions of dollars in shareholder value.

4. Kraft Heinz was created in July 2015 when Brazilian private equity firm 3G Capital engineered Heinz's acquisition of Kraft (the "Merger"). 3G Capital had a well-known history of large-scale acquisitions—including creating Anheuser-Busch InBev, the world's largest brewer, through serial acquisitions—and then instituting rigorous cost-cutting programs at the acquired company. In fact, 3G Capital promised the market it would deliver "best-in-class" profit margin growth by achieving $1.5 billion in "synergy" and "efficiency" cost-savings at Kraft Heinz after the Merger. While 3G Capital had a history of successful acquisitions, some investors worried that 3G Capital might focus on cost cutting at the expense of sales growth and brand investments.

5. As a result, leading up to and after the Merger took place, analysts and investors at every opportunity sought assurances from the Company's CEO Hees, former CFO Paulo Basilio ("Basilio"), Basilio's successor Knopf, Board of Directors Chairman Alexandre Behring ("Behring"), Chief Operating Officer of Kraft Heinz's U.S. Business George Zoghbi ("Zoghbi"), and President of Kraft Heinz Europe Rafael Oliveira ("Oliveira") that the Company was delivering the cost savings it repeatedly touted by achieving "synergies" and "efficiencies" that eliminated waste and redundancy and improved operational capacity, and that the cost-cutting program would drive investment in Kraft's iconic brands. In response, the Individual Defendants (defined below) repeatedly reassured investors that, for example, the Company would leverage its "significant synergy opportunities" to achieve "organic growth," in ways that would not "adversely affect[] current revenues and investments in future growth."

6.      3G Capital's purported focus on supply chain and brand investment was of particular importance at Kraft Heinz, because the Company's economic success depended upon an efficient global supply chain.  Thus, any disruption in the supply chain's components, from suppliers to supermarkets (which included transportation, factories, and warehouses), would cause ripple effects costing the Company millions and damaging or destroying customer relationships. Moreover, Kraft's value was inextricably tied to the strength of its iconic brands, such as Kraft "Mac and Cheese" and Oscar Mayer sliced meats, which were competing for shelf space with increasingly popular healthful food brands.  Thus, 3G Capital's promised investments in innovation and research-and-development ("R&D") were necessary for Kraft Heinz to keep pace in the modern marketplace.

7.      In reality, as Kraft Heinz's new leadership has recently admitted, since ***even before the Merger***, the individuals supporting the Merger had plans to, and did, implement an indiscriminate and unsustainably aggressive cost-cutting program, which dramatically scaled back Kraft Heinz's brand support and supply chain performance in order to achieve short-term margin expansion goals.  New CEO Patricio acknowledged as much in 2019, when he admitted that Kraft Heinz had been "pursuing a strategy that was ***more focused on inorganic growth*** [i.e., acquisitions] to the company," and needed to undergo a "fundamental change" to finally "pursue organic growth."  Kraft Heinz admitted in its Form 8-K filed with the SEC on August 10, 2015, that its plans to achieve "savings from productivity" through "cost savings initiatives" were "***contemplated prior to the merger***."

8.      The Individual Defendants pursued ever-expanding profit margins in service of a larger goal: to make yet another acquisition in order to fulfill their promises of top-line growth. Indeed, in February 2017, Kraft Heinz confirmed that it had bid $143 billion to take over Unilever,

a massive British-Dutch transnational consumer goods company. But Unilever rejected Kraft Heinz's offer, citing concerns that 3G Capital's cost-cutting strategy was not sustainable and ultimately destructive. In the wake of the Company's failed takeover bid, the market's concern about, and scrutiny of, the sustainability of 3G's cost-cutting strategy greatly intensified. In response, Defendants provided multiple clear and specific false reassurances that Kraft Heinz's cost-cutting efforts were sustainable. For example, when analysts questioned whether the model was "broken" and "not sustainable," Defendant Hees responded in the strongest terms, stating, "***Look, I strongly disagree with this statement . . . . the profitability level we have today allows us to invest strongly behind our brands and product quality***. So with that in mind, ***our strategy really continues to be focusing on creating profitable growth within the company***[.]"

9.      Investors began to get an inkling of the truth in November 2018, when the Company disclosed a significant miss to analysts' consensus expectations for the Company's third quarter 2018 "earnings before interest, taxes, depreciation, and amortization" ("EBITDA"), causing an immediate nearly 10% decline in Kraft Heinz's stock price. Kraft Heinz announced that part of that earnings miss was driven by the Company's decision to accelerate three years of future brand investment into 2018 to "kickstart" growth. The Company failed to disclose, however, that this "accelerated" investment was in truth catch-up spending to make up for the massive deficit in brand investment the Company had secretly accumulated in the years since the Merger.

10.      Then, after the market closed on February 21, 2019, Kraft Heinz shocked the market by disclosing a record-breaking impairment charge of ***$15.4 billion*** to write down the value of Kraft and Oscar Mayer brands, as well as the Company's receipt of a subpoena from the SEC in connection with an investigation into Kraft Heinz's accounting practices. The Company's massive asset impairment was the largest such write-down in the U.S. consumer staples industry in at least

a decade. Analysts were stunned by the Company's announcement, stating that the write-down "literally means the brand equities there aren't what they used to be" and questioning whether "the 3G belt-tightening strategy [was] go[ing] too far and . . . damag[ing] brands[.]"

11. In response to this devastating news, the price of Kraft Heinz stock plummeted 27%, from $48.18 per share on February 21 to $34.95 per share on February 22. The disclosures on this single day erased roughly *$11.5 billion* in shareholder value. Unable to certify the accuracy of its financial statements, Kraft Heinz announced that it would delay the filing of its Form 10-K with the SEC.

12. Rather than admit that the Kraft Heinz's cost-savings program since the Merger had eroded the Company's brand equities and eviscerated any hope of sustainable long-term growth and value, Defendants claimed that Kraft Heinz was taking this enormous permanent asset impairment simply because of the Company's purported failures to achieve forecasted cost savings in the Company's supply chain during just the last six months of 2018. Just a few months later, however, the Company's new CEO would directly contradict this self-serving claim and admit that the Company had been suffering massive supply chain difficulties for *years.*

13. Following the Company's devastating announcement in February 2019, the Company's investors were rocked by a series of further admissions. In April, the Company announced that Defendant Hees was being terminated and replaced with Patricio. Then, in May, the Company disclosed longstanding and widespread wrongdoing in its procurement department that would force the Company to restate its financial results since 2016. According to the Company, the restatement was necessary due to "*the number of years over which the misconduct occurred and the number of transactions, suppliers, and procurement employees involved.*" At

the same time, the Company announced that the SEC had issued a second subpoena—this time into the Company's reporting of asset impairments.

14.     Then, in June 2019, the Company belatedly filed its annual report, disclosing that the DOJ had joined the SEC's investigation into Kraft Heinz's accounting practices.  The Company also admitted that its internal investigation had uncovered fundamental material weaknesses in the "risk assessment" portion of the Company's internal controls over financial reporting, leading to additional material weaknesses with respect to its accounting for supplier contracts and goodwill testing.

15.     Finally, on August 8, 2019, the Company disclosed its results for the first half of 2019, which included significant sales and earnings misses.  New CEO Patricio also made significant admissions about the Company's culpability and hidden practices that led directly to the Company's negative results.  During a subsequent meeting between Patricio and analysts in early September 2019, Patricio admitted that ***supply chain losses had been increasing 15% year-over-year since the 2015 Merger.***  In direct contrast to Defendants' public statements about "sustainable" "synergistic" cost savings, as Barclays observed, Patricio "was rather candid that [the Company] pushed the cost cutting lever too hard and must reduce costs in a 'different way.'"  Finally, while Defendants had touted $1.7 billion in "sustainable" "synergies" and "efficiencies" achieved following the Merger, Patricio told analysts that ***virtually all of those savings*** (which were not, in fact, generated through "efficiencies")—approximately $1.5 billion—would need to be reinvested back into the Company in order to revive its ravaged infrastructure.  In sum, and as discussed in detail below, the savings that Defendants managed to extract out of Kraft Heinz to drive up the Company's stock price were wiped out when the Company had to come clean about the destruction in brand equity caused by its indiscriminate cost cutting.

16.     In total, from the first partial disclosure of the fraud until the last on August 8, 2019, Kraft Heinz's stock price declined from $56.20 to $26.50, a drop of *53%*.  This drop caused a loss of approximately *$36 billion* in market capitalization.

## II.     JURISDICTION AND VENUE

17.     The claims asserted in this Complaint arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

18.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

19.     Venue is proper in this Judicial District under 28 U.S.C. § 1391(b), Section 27 of the Exchange Act, 15 U.S.C. § 78aa(c).  Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading statements, occurred in substantial part in this District.  Additionally, Kraft Heinz's principal place of business is located in this District.

20.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications, and the facilities of a national securities exchange.

## III.    PARTIES

### A.  Plaintiff

21.     Plaintiff the City of Hollywood Police Officers' Retirement System acquired shares of Kraft Heinz common stock during the Class Period at prices that were artificially inflated as a result of Defendants' fraud.

**B. Defendants**

22. Defendant Kraft Heinz is a Delaware corporation, co-headquartered in Chicago, Illinois and Pittsburgh, Pennsylvania. The Company's common stock was actively traded on Nasdaq throughout the Class Period under the symbol "KHC." Kraft Heinz was created through a merger between Heinz and Kraft on July 2, 2015 and began trading publicly on July 6, 2015.

23. Following the Merger, Kraft Heinz was the third largest food and beverage manufacturer in North America and the fifth largest globally with more than $28 billion in global sales, and the steward of numerous iconic brands, including Heinz ketchup, Oscar Mayer meats, Kraft cheese products, Maxwell House coffee, Jell-O desserts, and Philadelphia cream cheese. During the Class Period, Kraft Heinz derived the vast majority of its revenue from sales in the United States and Canada. According to a July 6, 2015 analysis by Credit Suisse, approximately 76% of the Company's sales came from North American retail and food services, leaving the rest of the world to generate less than a quarter of the Company's sales. The Company's two most important and profitable brands following the Merger were the Oscar Mayer brand and the Kraft brand. As part of the purchase accounting for the Merger, Kraft Heinz valued the intangible assets of the Kraft brand at $15.9 billion and the Oscar Mayer brand at $6.6 billion.

24. Defendant 3G Capital Partners is a private equity firm with principal offices in New York, New York. 3G Capital, along with other partners, acquired Heinz in June 2013. Subsequently, 3G Capital and its affiliated funds orchestrated the July 2015 Merger between Kraft and Heinz that resulted in Kraft Heinz. Upon completion of the Merger, 3G Capital acquired approximately 25% of Kraft Heinz. 3G Capital Partners and its affiliated funds and business entities—including Defendant 3G Capital, Inc. (a Delaware corporation), and the following Cayman Islands business entities: Defendants 3G Global Food Holdings, L.P.; 3G Global Food

Holdings GP LP; 3G Capital Partners LP; 3G Capital Partners II LP; and 3G Capital Partners Ltd. (collectively and together with 3G Capital Partners, Defendant "3G Capital" or "3G") had the power to control, and did control Kraft Heinz, throughout the Class Period.

25.     Defendant Hees served as Kraft Heinz's CEO from the Company's inception in July 2015 until June 2019.  Prior to this, Hees served as the CEO of Heinz while it was under 3G Capital's control from 2013 to 2015.  Hees has been a Partner of 3G Capital since July of 2010.

26.     Defendant Basilio served as Kraft Heinz's CFO from the Company's inception in July 2015 until his appointment as Zone President of the United States on October 1, 2017.  In July 2019, Defendant Basilio became Kraft Heinz's Chief Business Planning and Development Officer. Before serving as Kraft Heinz's CFO, Basilio served as the CFO of Heinz while it was under 3G Capital's control from 2013-2015.  Basilio has been a Partner of 3G Capital since July of 2012.

27.     Defendant Behring was the Chairman of Kraft Heinz's Board of Directors during the Class Period.  He is a co-founder and Managing Partner of 3G Capital.

28.     Defendants Hees, Basilio, and Behring are collectively referred to herein as the "Individual Defendants."

### IV.     THE FRAUDULENT SCHEME

#### A.  Background of the Merger

29.     Kraft Heinz was formed on July 2, 2015 through the $48 billion Merger between Kraft and Heinz.  Prior to the Merger, Kraft was a publicly-traded company and Heinz was jointly owned by Berkshire Hathaway Inc. ("Berkshire") and 3G Capital.

30.     Prior to the Merger, Kraft, headquartered in Chicago, Illinois, was "one of the largest consumer packaged food and beverage companies in North America."  Kraft was founded in 1909 as a door-to-door cheese business and evolved to become a household brand name.  Kraft's iconic

products include, *inter alia*, Kraft cheese slices and macaroni and cheese, Oscar Mayer cold cuts and hot dogs, Philadelphia cream cheese, Planters nuts, and Maxwell House coffee. Kraft focused its business primarily in the United States and Canada. Kraft's customers included grocery store chains, supercenters, club stores, convenience stores, and other retail food stores in the U.S. and Canada. Kraft's largest Customer, Walmart, accounted for approximately 26% of the Company's net revenues in 2014.

31. Despite the ubiquity of Kraft's brands, Kraft had been facing challenges concerning changing consumer tastes as they trended toward more natural, healthy foods. In the year preceding the Merger, Kraft's revenue was effectively flat. As Kraft acknowledged to its investors prior to the Merger, it needed to implement a "plan that accelerates the pace of change, improves execution and puts Kraft on a clear path to long-term, sustainable growth."

32. Heinz's stature in America dates back even further than Kraft's, to its founding in Pittsburgh, Pennsylvania in 1869. Heinz started out selling horseradish and pickles and has now become a world-renowned brand. Although it is most famous for its ketchup, Heinz also owns Ore-Ida potatoes, Smart Ones frozen meals, and Classico pasta sauce, among other well-known products.

33. In 2013, 3G Capital and Berkshire teamed up to acquire Heinz in a take-private transaction for $23.3 billion. Heinz remained a private company for two years, until 3G Capital facilitated the Merger with Kraft, creating Kraft Heinz.

34. Founded in 2004, 3G Capital is a Brazilian private equity firm that focuses on cost cutting and restructuring by implementing "zero-based budgeting" ("ZBB") at its portfolio companies. An accounting practice invented in the 1960s, ZBB is a method of budgeting expenses in which budgets are crafted every year beginning at $0, and all business expenses must be

11

explained and justified for each new period. 3G has long been known for acquiring mature companies and cutting excess costs to fund investment using ZBB.

35. ZBB is not inherently a bad business model. In fact, it has been successfully deployed by numerous consumer goods companies, including Unilever PLC, Campbell Soup Co., and Kellogg Co. These companies use ZBB to ensure that cost cutting enhances, rather than impedes, growth by targeting duplication and waste, without scaling back on operational capability, innovation or brand support.

36. While 3G Capital did not invent ZBB, it popularized this budgeting practice through its many acquisitions, beginning with its founders' acquisitions of Brazilian beer companies. In 2008, 3G Capital-backed InBev took over Anheuser-Busch in a deal valued at $52 billion, forming AB InBev. Thereafter, in October 2010, 3G Capital acquired Burger King Worldwide Inc. 3G Capital then completed the combination of Burger King Worldwide Inc. and Tim Hortons Inc., the Canadian donut and coffee chain, in December 2014, forming Restaurant Brands International in an $11 billion deal.

37. The Merger was announced on March 25, 2015 via a joint press release by Kraft and Heinz. On April 10, 2015, Heinz filed a preliminary registration statement and prospectus on Form S-4 with the SEC ("S-4") with respect to the shares of Heinz common stock to be issued to Kraft shareholders pursuant to the Merger agreement. In the S-4, Heinz set out the Kraft Board of Directors' rationale for recommending the Merger, stating "that a combination with Heinz offers a scaled, global platform" to realize the "full potential" of Kraft. The S-4 also touted the benefits of the Merger, including "the synergies and other benefits to the combined company that could result from the merger, including an enhanced competitive and financial position, increased diversity and depth in its product line and geographic areas (providing for significant international

growth opportunities) and the potential to realize, according to Heinz management, an estimated $1.5 billion in annual cost savings from the increased scale of the new organization, the sharing of best practices and cost reductions by the end of 2017."

38.     On July 2, 2015, the Merger was completed.  Following the Merger, Heinz's controlling shareholders (Berkshire and 3G Capital) owned approximately 51% of the outstanding shares of Kraft Heinz common stock, with Kraft shareholders owning the remaining 49% of the combined company.  As a result of the Merger, Kraft Heinz became the third largest food and beverage manufacturer in North America and the fifth largest globally with more than $28 billion in global sales and the steward of numerous iconic brands.  The Company placed tremendous value on the strength of Kraft's trademarks. In connection with the Merger, the Company recorded the fair value of Kraft's intangible assets as approximately $48 billion.  Kraft's brand trademarks accounted for $43.1 billion of this value.

39.     The Company made it clear that, from "Day One" of Kraft Heinz's existence as a combined company, Kraft Heinz would follow 3G Capital's operational vision and that 3G Capital's hand-picked executives would helm Kraft Heinz's operations.  In addition to Defendant Behring, one of 3G Capital's co-founders, becoming chair of Kraft Heinz's Board of Directors, 3G Capital also appointed its two other co-founders, Jorge Paulo Lemann and Marcel Herrmann Telles, to the Board. Defendant Hees, a 3G Capital partner, was designated to serve as CEO of the Company, and Defendant Basilio, also a 3G Capital partner, was designated as CFO.

### B.  Defendants' Falsely Promised Sustainable Cost Savings and Brand Investment

40.     In the run-up to the Merger, 3G Capital told investors that it would accelerate the combined company's earnings growth in two ways.  It would (1) extract "significant cost efficiency and synergies" from Kraft Heinz, producing "$1.5 billion in run-rate annual costs

savings by 2017"; and (2) invest in the Company's iconic brands and infrastructure to "drive top-line growth and profitability." Accordingly, 3G Capital assured investors that Kraft Heinz would be focused, not on brute force cost cuts that would only temporarily expand its profit margin, but rather on extracting efficiencies, synergies, and integration savings. As described by Defendants and accepted by the market, these "synergies" and efficiencies represented the value derived from strategically eliminating duplicate and redundant operations in the combined company—not from reduction of core operational capacity or capability. "Synergy" savings result in an ability to achieve equivalent or greater operating capacity at lower cost through a business combination. Kraft Heinz purported to draw these savings from various segments of the Company's operations: reducing personnel with redundant responsibilities, eliminating duplication in the supply chain, and making use of shared resources to achieve equivalent or greater supply chain capability. These cuts, when focused on areas where true synergies exist, would not only allow the Company to reduce its budget, but also produce an even greater outcome for the Company built on untapped efficiencies. As Defendant Hees put it, "We want to have business where 2+2 is more than 4."

41. 3G Capital's reassurances were critically important to the market. Investors initially worried that 3G Capital would attempt to expand Kraft Heinz's operating margins through, as Deutsche Bank analysts put it, "relentless cost reduction" at the expense of brand investment and operational performance. Investors sought reassurances from Defendants that 3G Capital would deploy zero-based budgeting (defined above as "ZBB") in a growth-centric way, rather than, as Credit Suisse analysts worried in a March 25, 2015 report, cutting "muscle, not just fat" when it assumed control of Kraft Heinz, "thus sacrificing its ability to generate sustainable growth."

14

42.     To quell these concerns, 3G Capital emphasized that it would invest heavily in growing the Company's brands, and would achieve savings only by removing duplication, waste, and excess cost from legacy businesses, rather than scaling back operational performance and brand support.  3G Capital repeatedly stressed its "proven track record of ***investing in and growing iconic brands***" at its portfolio companies.  When asked by Morningstar analysts whether the Company's cost-cutting strategy was a "viable longer-term strategy for firms in the consumer products industry," Defendants assured the analysts "that they intend to be long-term investors in the business rather than simply looking for short-term returns."  On investor calls prior to the Merger, 3G Capital promised "additional marketing and brand reinvestment behind the KRFT brands moving forward."

43.     In particular, 3G Capital assured investors that its efficiency-driven strategy focused on improving the performance of the Company's "supply chain," i.e., the network developed by a company to supply, produce, and distribute its products.  During an April 22, 2015 conference with analysts, Kraft Heinz's new management promised to "take extra time to make sure it gets . . . the supply chain right."  Defendants' reassurances that the Company would achieve cost savings by eliminating waste and redundancy rather than scaling back support were important because any interruptions to the Company's global supply chain could be disastrous.  In fact, a recent World Economic Forum report concluded that significant supply chain disruptions reduce the share price of affected companies by ***seven percent*** on average.

44.     Analysts and investors credited Defendants' statements.  For instance, RBC analysts reported that, based on 3G Capital's statements, they were comforted that Kraft Heinz's "cost reductions [would] prove sustainable."  Similarly, Morningstar analysts were also comforted that 3G Capital was committed to providing strong investment support for the Company's brands, concluding that annual sales growth would increase "driven by brand reinvestments" which would

be "funded by planned cost savings." In a May 7, 2015 note, Credit Suisse observed that 3G Capital "touted this merger of Kraft and Heinz for its potential to *generate growth rather than just margin expansion*."

45. As their own statements reveal, Defendants understood that Kraft Heinz's ability to both achieve sustainable cost savings and invest in the Company's brands and infrastructure were *the most important issues* facing the Company prior to the Merger and during the Class Period. Indeed, at every chance, Defendants touted Kraft Heinz's synergistic cost savings and its investment in its brands, including in direct response to numerous analyst questions on those subjects.

### C. Unbeknownst to Investors, Kraft Heinz Planned to, and Did, Implement Destructive, Unsustainable Cost-Cutting Measures

46. From the earliest days following the Merger, the reality inside Kraft Heinz bore scant resemblance to Defendants' public statements. Even before the Merger closed, Defendants understood that Kraft Heinz could not generate the "best-in-class" margins that Defendants had promised investors through "synergies," "efficiencies," and "integration savings" alone. There was simply not enough "fat" to be cut within the newly-acquired Kraft, meaning that eliminating *only* redundancy and duplication would not fuel a significant jump in profitability.

47. Defendants knew, through their extensive due diligence pre-dating and in connection with the Merger, that their promised cost-cutting measures were unrealistic without harming the core brands of the Company.

48. At the same time, Defendants faced enormous pressure to deliver on 3G Capital's short-term promises of expansive profit margin growth. To that end, as Defendant Hees' successor, Miguel Patricio, later acknowledged, Kraft Heinz was internally intensely focused on growing the Company "inorganically"—i.e., through business combinations with other

16

companies—rather than by investing in growing sales of Kraft Heinz products as Defendants had promised. Patricio acknowledged that Kraft Heinz had been "pursuing a strategy that was *more focused on inorganic growth* to the company," and needed to undergo a "fundamental change" in order to finally "pursue organic growth." Delivering on Kraft Heinz's short-term promises of margin expansion was key to Defendants' merger-driven strategy. Because Kraft Heinz would use its stock as currency in any subsequent merger, it needed to keep the price of that stock high in order to maximize its flexibility to consummate a future deal. In order to keep its stock price high, it was essential that Kraft Heinz report the "industry-leading" earnings margins it had promised investors.

49. Kraft Heinz faced enormous near-term pressure to achieve "industry-leading" margin expansion and cost-savings targets that, as the Company only later acknowledged in its 2018 Form 10-K, "became or were perceived [internally] to have become increasingly difficult to attain." As Kraft Heinz's new leadership has now admitted, and contrary to Defendants' assurances made to investors in reality, Kraft Heinz knew that it would have to resort to implementing a brute-force cost-cutting program that dramatically scaled back its brand support and supply chain performance in order to achieve its short-term margin expansion goals—a sacrifice Defendants had explicitly and assured investors that Kraft Heinz would not make.

### D. Patricio's 2019 Statements Confirm Aggressive and Unsustainable Cost-Cutting From the Earliest Days Following the Merger

50. Kraft Heinz knew from even before the Merger that the increased profitability it touted would only be possible through aggressive and unsustainable cost-cutting measures. Kraft Heinz's new CEO, Miguel Patricio acknowledged in 2019 that Kraft Heinz had "*several problems in different types of products with our service level* . . . [T]here are still scars from the past [and customers] questioned that if this is sustainable or not . . . *their number one concern, is really*

*service level*." These problems were so glaring that Patricio stated that "*[f]rom day one*" he "defined supply [chain] as a big area for improvement," in which Kraft Heinz would need to invest in "our people, in our factories" and "*change the mentality from basically cost-cutting into continuous improvement*." He further stated that Kraft Heinz never implemented an "organic process for achieving ongoing productivity," which ultimately led to "*supply chain losses [that] have been increasing, actually, double digits in the last years*" and "*pretty big disruptions in the past with our customers for—because of low service levels*."

51.     Patricio further acknowledged that the Company had underinvested in its brands and by cutting back on core media and promotion, as he stated, "we need to invest more, especially in our people and our brands . . . . *[O]ur media investments are below where they should be*." Patricio further acknowledged that the Company had underinvested in R&D, stating "*innovation is an area that we have to increase, we'll have to improve dramatically.*"

52.     Patricio admitted that the $1.7 billion in "sustainable" "synergies" and "efficiencies" that were touted in connection with the Merger were illusory when he explained in 2019 that the Company's infrastructure had been ravaged and would require two years to "stabilize the business."

53.     As Kraft Heinz's new leadership acknowledged in 2019, the Company also implemented dramatic and debilitating cuts to core marketing, promotion, R&D, and other brand support functions, causing the value of the Company's once iconic brands to collapse. On his first earnings call with Kraft Heinz, Patricio admitted that "we need to invest more, especially in our people and our brands. I think that, as I said before, that *our media investments are below where they should be*." As he entered his new role, he recognized "the big homework to be done in marketing," and that Kraft Heinz could, "do better and *consistently invest in our brands*." Basilio

18

supported this assessment when he returned as CFO, stating that he "found a lot of opportunities to invest . . . behind media, behind higher support from a more concentrated set of innovation."

54.     Likewise, on the Company's October 31, 2019 call, Patricio revealed that, contrary to Defendants' prior statements to investors that the Company was making significant investments in R&D, Kraft Heinz had not supported R&D, explaining that "***innovation is an area that we have to increase, we'll have to improve dramatically.*** There are other areas that I think that we have to our capabilities. And—but I think that innovation is one that I'm very focused on." Patricio admitted that, almost ***immediately*** after arriving, in the days following the Merger, he recognized that Kraft Heinz lacked an infrastructure or organization to support R&D.

## V.     DEFENDANTS' FALSE AND MISLEADING STATEMENTS

### A.  Press Release Dated March 25, 2015

55.     On March 25, 2015, Kraft Foods Group and H.J. Heinz Company issued a joint press release announcing that the Merger had been agreed upon. The press release pointed to "***[s]ignificant synergy opportunities*** with strong platform for ***organic growth*** in North America, as well as global expansion, by combining Kraft's brands with Heinz's international platform." It also stated that the "complimentary nature" of Kraft's and Heinz's brand portfolios would present a "substantial opportunity for synergies, which will result in increased investments in marketing and innovation."

56.     The foregoing statements were false and misleading because they told investors that the combined company would have "significant synergy opportunities," but, in fact, Kraft Heinz would not be able to achieve the touted cost savings through "synergy opportunities," but rather Defendants planned to, and did, implement across-the board cost cuts that dramatically scaled

back essential brand support and supply chain performance and function. Defendants never had plans to develop "organic growth," within Kraft Heinz.

### B. Press Conference Held on March 25, 2015

57.    On March 25, 2015, a joint conference call was held to announce the Merger and answer analysts' questions.  Speaking at the conference were Defendants Hees and Behring, among others.  They made the following statements, which were false and misleading.

58.    Defendant Behring stated:

"[T]his combination will generate substantial synergies, which we currently expect to be about $1.5 billion, as well as many revenue expansion opportunities both domestically and abroad."

Speaking of 3G, Behring added:

 "In all of these cases, *we have taken a long-term approach to investing, and are committed to building strong and enduring global consumer grands*.  We've worked closely with the team at Heinz over the past two years to truly transform every aspect of the business.  Berkshire shares our vision, and *we intend to bring the same proven playbook to the new Kraft Heinz Company to maximize long-term value for all of its shareholders*."

59.    Behring also stated:

"[B]oth Berkshire and 3G Capital are long-term oriented investors with shared vision and common values.  You can bet that we will always act in the best long-term interests of Kraft shareholders, because this will be a long-term interest in which we are deeply invested. . . .Both Berkshire and 3G look for strong enduring brands *and they seek to build and grow these brands through both meaningful operational improvements and a focus on execution*."

60.    During the conference call, Defendant Hees stated, that Heinz's "international exposure is really *key to our long-term growth story* and certainly will be important for the combined company going forward."  Defendant Hees further stated:

We are proud of what we have accomplished already, but more importantly *we are excited about the opportunity for ongoing improvement*.  We have accomplished a lot on the cost side of the equation.  And as I said before, we believe there is still opportunity there.  But

the other great opportunity in front of us is to return Heinz to its long-term historical growth profile. And *we have a clear well-defined strategy to execute on our growth plans*.

First we are *increasing our commitment to marketing by reinvesting savings from some of our cost initiatives in the brands that can take the most profit from it*, a very targeted approach to maximize the potential of our brands to profitable growth. Second, *we have refocused our strategic vision on innovation.* In the past, Innovation effort has been too diffused and diluted, introducing lots of products to see what works, with no focus on profitability. Our goal is to be an industry-leading innovator in the consumer food space, and we will aim to deliver on this goal by focusing on big bold bets.

61.     The foregoing statements were false and misleading because they gave the impression that Defendants would operate Kraft Heinz in such a manner so as to generate long-term and sustainable growth, when in reality, Defendants' plan was to slash costs indiscriminately, generating the short-term appearance of health and profitability at the expense of long-term value. These indiscriminate cost-cutting measures were unsustainable, and were not designed to grow the combined company. In particular, Defendants had no plans to "reinvest savings . . . in the brands," to "execute on . . . growth plans," or to focus on "innovation." The strategy for the combined company had nothing to do with "maximiz[ing] long-term value" for its shareholders. Rather, the plan was to apply aggressive cuts to generate a short-term boost in profitability at the expense of long-term growth, and at the expense of Kraft's and Heinz's brands.

### C. The Registration Statement and Proxy Statement

62.     On April 10, 2015, Heinz filed a preliminary registration statement and proxy statement on Form S-4 with respect to the Merger. Heinz filed amended registration statements and proxy statements on May 18, 2015, May 29, 2015 and May 29, 2015.

63.     On June 2, 2015, Heinz filed its final amended registration statement and proxy statement. Each of these registration and proxy statements included the following false and misleading statements:

21

64. First, in explaining the Kraft Board's decision to move forward with the Merger, the Form S-4 stated on page 59 that, "the Kraft board discussed the likelihood of Kraft being able to achieve the Upside Case of the 2015 Financial Plan, ***particularly with respect to cost savings initiatives***, on a standalone basis, and the likelihood that ***Heinz could achieve the synergies*** they had identified for the combined company.

65. Second, the Form S-4 stated on page 60 that one "material factor" that "weigh[ed] positively in favor of the merger" was "***the synergies and other benefits to the combined company that could result from the merger***, including an enhanced competitive and financial position, increased diversity and depth in its product line and geographic areas (providing for significant international growth opportunities) and the potential to realize, according to Heinz management, ***an estimated $1.5 billion in annual cost savings*** form the increased scale of the new organization, the sharing of best practices and cost reductions by the end of 2017."'

66. The foregoing statements were false and misleading because they told investors that the combined company would have "synergies and other benefits," including "cost savings"," but, in fact, Kraft Heinz would not be able to achieve the touted cost savings through "synergies and other benefits," or "cost savings" through sustainable measures. Instead, Defendants would have to, and did, implement across-the board cost cuts that dramatically scaled back essential brand support and supply chain performance and function. Moreover, the results of Kraft Heinz's cost-cutting program rendered the statements misleading because, from the outset, the cost-cutting measures caused dramatically reduced productivity, service quality, distribution, and ultimately, loss of significant business.

67. Third, Form S-4 lists on page 34, the following as a risk of the Merger:

The success of the merger will depend on, among other things, Heinz's ability to combine its business with that of Kraft in a manner that ***facilitates growth***

*opportunities and realizes anticipated growth and cost savings*.  Heinz believes that the merger will provide *an opportunity for growth* in food and beverage products and other areas, including a number of new business areas for Heinz.

However, Heinz must successfully combine the businesses of Heinz and Kraft in a manner that *permits these anticipated benefits to be realized*.  In addition, the combined company *must achieve the anticipated growth and cost savings without adversely affecting current revenues and investments in future growth*.  If the combined company is not able to successfully achieve these objectives, the anticipated benefits of the merger may not be fully realized, or at all, or may take longer to realize than expected.

68.     The foregoing statements were false and misleading because they led investors to believe that Kraft Heinz would attempt to realize "anticipated growth and cost savings without adversely affecting current revenues and investments in future growth."  In fact, even before the Merger closed, Defendants would have recognized through their considerable due diligence that the promised cost savings could not be achieved without harming the Company's ability to maintain or increase revenues and without eliminating all investments in future growth.

69.     Fourth, the Form S-4 also lists Heinz's reasons for the Merger.  These include, on page 77, that "the combination of Heinz and Kraft would create *opportunities to implement operating efficiencies and realize synergies*, including estimated annual cost savings of up to $1.5 billion."  Heinz's reasons for the merger also stated that the combination of Heinz and Kraft would:

Meaningfully increase Heinz's scale in North America across both retail and foodservice, creating the largest food and beverage company in North America;

*Diversify Heinz's category exposure across a variety of new growing and stable product categories* such as cheese and meats; and

Create an opportunity to leverage Heinz's existing international infrastructure to *expand the presence of Kraft brands overseas*.

70.     The foregoing statements were false and misleading false and misleading because they signaled to investors that the combined company would have "operating efficiencies,"

23

"synergies," and "cost savings of up to $1.5 billion," but, in fact, Kraft Heinz would not be able to achieve the touted cost savings through "synergies," "operating efficiencies" or "cost savings" through sustainable measures. They further wrongly suggested that Defendants would work to "[d]iversify" products and "expand the presence" of brands. Instead, Defendants planned to, and did, to implement across-the board cost cuts that dramatically scaled back essential brand support and supply chain performance and function. Moreover, the results of Kraft Heinz's cost-cutting program rendered the statements misleading because, from the outset, the cost-cutting measures caused dramatically reduced productivity, service quality, distribution, and ultimately, loss of significant business.

71.     Fifth, the Form S-4 also contained a risk statement concerning Kraft Heinz's product innovation that was false and misleading. Specifically, it stated on page 43, "success is dependent upon *Heinz's ability to identify and respond to consumer trends through innovation*. Heinz may be required to increase expenditures for new product development. Heinz may not be successful in developing new products or improving existing products, or its new products may not achieve consumer acceptance, each of which could materially and negatively impact sales."

72.     This risk statement was false and misleading because, unbeknownst to investors, since the time of the Merger, Defendants had no intention of putting any resources towards "developing new products or improving existing products," or to "identify and respond to consumer trends through innovation." In fact, as Patricio admitted in 2019, the Company had underinvested in R&D, and he further stated, "innovation is an area that we have to increase, we'll have to improve dramatically." In fact, far from putting any resources into product innovation, Kraft Heinz had planned to implement deep cost cuts that would dramatically scale back essential brand support and innovation efforts.

73.     Sixth, the Registration Statement and Proxy Statement also stated that Kraft would be increasing its goodwill by $19.1 billion.  It explained, "[a]fter giving effect to the merger, the total increase to the Kraft Heinz Company goodwill attributable to Kraft is $30.4 billion.  Goodwill is attributable to ***planned growth in new markets and synergies expected to be achieved*** from the combined operations of Heinz and Kraft."

74.     This statement was false and misleading because Defendants did not have any "planned growth in new markets."  In fact, far from putting any resources into "growth in new markets", Kraft Heinz had planned to implement deep cost cuts that would dramatically scale back essential brand support and innovation efforts.

### D.  Additional False Statements Prior to the Class Period

75.     On June 29, 2015, Kraft and Heinz filed a joint press release on a Form 8-K with the SEC identifying the senior leadership team of the soon-to-be-formed Kraft Heinz entity.  In it, Mr. Hees stated that he was "thrilled that this world-class group of executives will join [him] to ***further strengthen our iconic brands with our industry-leading go-to-market strategies, innovation pipeline, and global infrastructure***."

76.     The foregoing statement was false and misleading.  In fact, Defendants had no intention of "further strengthening" Kraft's or Heinz's brands, but rather had plans to implement across-the board cost cuts that dramatically scaled back essential brand support and supply chain performance and function.  Moreover, the results of Kraft Heinz's cost-cutting program rendered the statements misleading because, from the outset, the cost-cutting measures caused dramatically reduced productivity, service quality, distribution, and ultimately, loss of significant business.

### E. Form 10-Q Filed on August 10, 2015 and Related Press Release

77.    On August 10, 2015, Kraft Heinz filed its first Form 10-Q with the SEC.  It included the following false and misleading statements.

78.    First, on page 11, the Form 10-Q reported that the "2015 Merger preliminarily resulted in $32.9 billion of non tax deductible goodwill relating principally to synergies expected to be achieved from the combined operations and planned growth in new market."

79.    The foregoing statements was false and misleading because it suggested to investors that $32.9 billion in synergies could be achieved through the Merger.  In fact, as would be reported in 2019, the Company was forced to take a $15.4 billion writedown in goodwill.  This is because the touted synergies could not be achieved through sustainable cost-cutting practices.  Moreover, the results of Kraft Heinz's cost-cutting program rendered the statements misleading because, from the outset, the cost-cutting measures caused dramatically reduced productivity, service quality, distribution, and ultimately, loss of significant business.

80.    Second, on page 53, Kraft Heinz cited the following as risk factors: (i) "combining the businesses of Kraft and Heinz and meeting the capital requirements of the combined company in a manner *that permits us to achieve the cost savings anticipated from the 2015 Merger*;" (ii) "*identifying and eliminating redundant and underperforming functions and assets*."

81.    The foregoing statement was false and misleading because it failed to explain to investors that the "cost savings anticipated from the 2015 Merger" could only be achieved through unsustainable cost-cutting measures.  Moreover, the results of Kraft Heinz's cost-cutting program rendered the statements misleading because, from the outset, the cost-cutting measures caused dramatically reduced productivity, service quality, distribution, and ultimately, loss of significant

business. Furthermore, the cost-saving measures were not grounded in "identifying and eliminating redundant and underperforming functions."

82.    On August 10, 2015, Kraft Heinz issued a press release on a Form 8-K filed with the SEC. It reiterated Kraft Heinz's "expectation to *generate aggressive, run-rate cost savings of $1.5 billion by the end of 2017, inclusive of savings from productivity and cost savings initiatives contemplated prior to the merger*."

83.    The foregoing statement was false and misleading because Defendants did not disclose that the anticipated cost savings could only be achieved through aggressive, unsustainable cost-cutting measures. Moreover, the results of Kraft Heinz's cost-cutting program rendered the statements misleading because, from the outset, the cost-cutting measures caused dramatically reduced productivity, service quality, distribution, and ultimately, loss of significant business. Furthermore, the cost-saving measures were not grounded in "identifying and eliminating redundant and underperforming functions."

## VI.    THE TRUTH COMES OUT

### A.    Kraft Heinz Announced Declining Earnings and Margins Caused by Unsustainable Cost Saving Measures

84.    After the market close on November 1, 2018, Kraft Heinz announced dismal third quarter 2018 financial results, including a more than 30% sequential decline in operating income and a more than 14% sequential decline in EBITDA—the latter missing consensus estimates by $140 million. On its earnings call that night, Kraft Heinz management disclosed that the Company's shrinking margins and declining profitability were driven by its inability to achieve targeted cost cuts and ramped up investment that had been necessary to support its brands, including a substantial price cut. These disclosures partially revealed to the market that, contrary to Defendants' prior public statements, Kraft Heinz was not in a position to pursue additional

optimizing cost cuts to expand its margin. Instead, Kraft Heinz would be forced to expend additional capital to reinvest in its weakening brands and hollowed-out supply chain.

85.     First, Kraft Heinz management disclosed that the Company had been unable to achieve incremental cost cuts without impairing its operations and, in particular, that Kraft Heinz had been forced to delay numerous cost-savings projects relating to its supply chain in order to keep it functioning even as volumes increased by less than 3%. Defendant Hees, for instance, acknowledged, "*Cost is one area we are falling short this year*," which he attributed to the Company's "desire to invest and protect customer service as we ramp up volumes as well as related decisions to delay some savings projects to avoid operational disruption." Knopf stated that these missed cost savings were "quite significant." Knopf also explained, the Company's additional volume perversely "came at *additional* cost." Thus, far from optimizing the Company's supply chain, Kraft Heinz's cost cutting had diminished its operational capabilities such that incremental volume actually drove an increase in cost of goods sold—precisely the opposite of the way a functional supply chain should work.

86.     Second, Kraft Heinz disclosed that its significant earnings miss was also driven by a "disproportionate impact from commercial investments, particularly marketing, as [it] stepped up [its] investment levels in the second half of the year." Kraft Heinz's ramped up investments in its lagging brands indicated it was being forced to make up for years of underinvestment. Indeed, in response to an analyst question wondering why investments had suddenly and unexpectedly increased, Knopf stated that Kraft Heinz had "***accelerated what would have been 3 years of commercial investments into 2018***." Indeed, the Company disclosed that it had been forced to slash prices on its brands in order "to support our commercial pipeline, including higher year-over-year support in natural cheese and ready-to-drink beverages." Importantly, the fact that these

28

substantial investments, including Kraft Heinz's substantial price cut, generated a less than 3% increase in sales, partially disclosed to the market the degree of brand erosion Kraft Heinz had sustained.

87.     Analysts were troubled by Kraft Heinz's disclosures.  For instance, in a November 2, 2018 report, Morningstar analysts highlighted the Company's "eroding" operating margins resulting from its failure to achieve cost targets and its "need for increased promotional spending." These analysts concluded, "[a]lthough organic sales growth edged up 2.6%, we think this performance is *evidence that Kraft Heinz has failed to build much in the way of pricing power*." Notably, Morningstar analysts specifically contrasted this revelation with Defendants' "*past rhetoric [which] had suggested management maintained an appetite to up brand spending to support its competitive prowess* (both with its retail partners and end consumers)."  Likewise, Credit Suisse analysts issued a November 2, 2018 report noting that the Company's disclosures indicated Kraft Heinz had "cut back way too far on marketing and product development infrastructure."  Given Kraft Heinz's substantially weakened operational infrastructure, these analysts concluded the Company "will need to keep launching margin dilutive products with co-packers and keep meeting customers' stringent 'just-in-time delivery' demands in a high freight cost environment.  As a result, we think investors should expect further margin erosion from these factors."

88.     Similarly, in a November 2, 2018 report, Susquehanna analysts downgraded Kraft Heinz stock to "Negative," concluding that "***the increased spending after two years of steep cost cuts may be mostly about catching up***" and noted their "shaken confidence in management." Finally, in another November 2, 2018 report, Wells Fargo analysts observed that, as a sign of Kraft Heinz's brand erosion, the Company had achieved only a marginal increase in sales notwithstanding

a significant increase in investment: "the model didn't exactly deliver three years' worth of growth in conjunction with three years' worth of investment." Moreover, these analysts worried it was "conceivable that KHC continues to delay productivity initiatives and emphasizes service levels (a net cost)," taking pains to point out that Kraft Heinz was "not known for [providing] copious financial detail."

89. In response to the Company's November 1, 2018 disclosures, Kraft Heinz stock declined nearly 10%, falling from $56.20 per share on November 1 to $50.73 per share on November 2, 2018 on high volume.

90. At the same time, however, Defendants false statements to soothe investors, characterizing Kraft Heinz's inability to deliver cost savings and stepped-up brand investment as "one-off" headwinds, in order to quell market concern. On the Company's earnings call, CEO Hees told investors that "third quarter profitability was held back by several *one-off factors*, including commercial investment" and "our decision to prioritize customer service as we saw volumes ramp up and forego some degree of profitability in the *short term*." Hees further stated that the Company's performance had been "dominated by a number of *transitory issues* on both the sales and cost sides of the equation that we do not expect to repeat . . . . Going forward, we feel good about our ability to continue driving commercial growth and our ability to drive EBITDA dollar growth and industry-leading margins as one-off factors fall away and the contribution from our savings initiatives accelerate." Similarly, in response to an analyst question about why "there's not ultimately the need for another significant step-up" in Kraft Heinz's commercial spending, Hees replied, "I think the numbers are already in our base. We are not seeing the reason to increase that into 2019." Knopf likewise characterized Kraft Heinz's inability to deliver cost savings and its need to increase brand investment as "one-off factors," assuring investors that Kraft

Heinz had the "ability to drive EBITDA dollars and [at] industry-leading margins as one-off factors fall away and the contributions from our savings curve accelerate." Basilio further emphasized that the Company's investment in price cuts, in particular, was transitory: "We believe that we have a very strong portfolio of brands with ability to price as we've been showing over the past several quarters, as we mentioned." Finally, the Company assured investors that the Company's Canadian operations were strong with a robust pipeline of planned activity.

91. Defendants' soothing statements tempered the market's reaction to the Company's November 1, 2018 disclosures. For instance, BMO analysts issued a November 2, 2018 report echoing Defendants' false soothing statements: "KHC expressed confidence in its ability to sustain organic sales growth into 4Q18 and beyond while expecting both EBITDA growth and margin to improve next quarter and into 2019 in large part as a number of issues affecting profit will not repeat and sales momentum should continue." In a report dated the same day, Jefferies analysts dismissed investors who "concluded that KHC had to lower prices and offer discounts to grow sales [and therefore that] growth [would] com[e] at the expense of margins going forward." Instead, those analysts credited Defendants' statements that Kraft Heinz was making a "***one-time step-up in brand investments to kickstart growth***." Accordingly, they concluded, while some "investors view the profit miss as structural . . . we view it as transitory." Deutsche Bank analysts also repeated Defendants' false statements, stating that "[t]he wide margin miss was in fact driven by higher one-time costs (to the tune of roughly $100mm incremental) Which shouldn't repeat," in a November 2, 2018 report. Finally, Credit Suisse analysts highlighted that "the company expects Canada to return to growth with a strong pipeline of planned activities."

### B. Kraft Heinz Announced $15.4 Billion in Intangible Impairment Charges and an SEC Investigation

92.     After the market closed on Thursday, February 21, 2019, Kraft Heinz shocked the market with a raft of bad news: an impairment charge of ***$15.4 billion*** to write-down the value of the Kraft and Oscar Mayer brands, a significant loss against analyst expectations for the fourth quarter 2018 results, and an investigation into its accounting practices by the SEC. These disclosures revealed that Defendants' prior statements concerning Kraft Heinz's business model were false and that, as analysts immediately observed, the Company's industry-leading margins were in fact a "façade" masking an unsustainable business model.

93.     <u>First</u>, Kraft Heinz disclosed that it had recorded non-cash impairment charges of $15.4 billion, which dragged the Company's reported net income to an annual loss of $10.3 billion—a drop of ***over $20 billion*** from the year before. Kraft Heinz recorded impairments to lower the carrying amount of goodwill in certain reporting units (primarily the U.S Refrigerated and Canada Retail units) and the value of certain intangible assets, primarily the Kraft and Oscar Mayer trademarks. The Company's massive goodwill impairment was the largest such write-down in the U.S. consumer staples industry in at least a decade. According to Knopf, during a call with analysts that night, the write-downs "reflected revised margin expectations" primarily for Kraft natural cheese, Oscar Mayer cold cuts, and the Canadian retail business. Knopf further elaborated that the "fundamental driver" behind these revised expectations was Kraft Heinz's second-half 2018 performance, which was "primarily driven by supply chain issues...[on] the cost side." Defendant Basilio clarified that the impairments were driven by the Company's failure to deliver expected "cost savings" in the supply chain.

94.     <u>Second</u>, Kraft Heinz reported disappointing fourth quarter 2018 results, with adjusted EBITDA of $1.7 billion—a 14% decline year-over-year and a significant miss against

consensus EBITDA expectations of $1.92 billion. Notably, Kraft Heinz also reported a compressed profit margin before interest and taxes of 23.2% in 2018, a significant decline from 27.2% in 2015 when Kraft Heinz was formed. Defendant Hees stated during the analyst call that day that the "entire" EBITDA miss was driven by "net savings versus expectations within our United States supply chain" and that the "core cause of our shortfall . . . was forecasting the pace and magnitude of our savings curve in 2018[.]" Knopf further clarified that "anticipated savings did not materialize, particularly in our procurement area[.]"

95. <u>Third</u>, Kraft Heinz also revealed that it had received a subpoena from the SEC in October 2018 concerning the Company's procurement area, "more specifically the Company's accounting policies, procedures, and internal controls related to its procurement function, including, but not limited to, agreements, side agreements, and changes or modifications to its agreements with its vendors." As a result of this subpoena, the Company initiated an internal investigation with outside counsel into Kraft Heinz's procurement area, which determined that the Company should have recorded a $25 million increase to the costs of products sold in prior periods, which the Company recorded in the fourth quarter 2018. The Company further disclosed that, as a result of this SEC investigation and its internal investigation, the Company would implement "certain improvements to its internal controls to mitigate the likelihood of this occurring in the future" and had "taken other remedial measures."

96. <u>Fourth</u>, the Company broke with its established practice in order to "properly level-set[] expectations" and announced guidance for adjusted EBITDA for 2019 of $6.3 billion to $6.5 billion—an approximate 13–16% decline in annual adjusted EBITDA from Kraft Heinz's average adjusted EBITDA during its tenure as a combined company.

97.     Analysts were stunned by the Company's announcement.  During the Company's call with analysts to discuss these results, Kenneth Goldman from J.P. Morgan Chase & Co. observed that the $15 billion write-down on Kraft and Oscar Mayer "literally means the brand equities there aren't what they used to be."  Goldman further questioned whether there was at least some evidence starting to point" to "the 3G [Capital] belt-tightening strategy go[ing] too far and . . . damag[ing] brands[.]"

98.     Following the Company's announcement, multiple firms downgraded Kraft Heinz stock.  For example, Piper Jaffray downgraded Kraft Heinz from Overweight to Neutral, writing that "[w]e believe these impairments validate fears that KHC may have been more focused on costs than building brand equity, and even if management now has 'seen the light,' we are concerned that its brands lack the equity to drive pricing power needed to compete and drive growth in a sustainable way."  Similarly, Barclays downgraded Kraft Heinz to Equal Weight from Overweight, stating that Kraft Heinz's announced results were "beyond any prediction" and that "while a challenging industry backdrop is likely partly to blame, frankly, we believe some of KHC's issues are distinct."  BMO Capital Markets wrote that "KHC has far exceeded our worst-case scenario on multiple levels" and "we are most struck by the shortcoming in what was anticipated to be [Kraft Heinz's] core competency—execution and cost savings—as the lack of proper financial planning, operational miscues, and failed cost savings are at the core of its challenges.  ***Its superior margin structure was a façade***, as its savings curve will be pushed out and the magnitude of savings will be far less."

99.     Multiple analysts also observed that the SEC subpoena—including the facts that the Company did not disclose it in their November 2018 quarterly report and that it drove Kraft to disclose internal control deficiencies and financial misstatements, rather than being discovered by Kraft Heinz's own controls—was indicative of management "credibility" issues.  BMO Capital

Markets wrote on February 22, 2019 that "[a]lbeit small, the SEC investigation creates a level of uncertainty for KHC's accounting issues and the requirements/capital needed to shore up its financial planning and controls to avoid future investigations into the company's accounting policies." CFRA wrote in a February 22, 2019 report that "we are also troubled by KHC's disclosure in today's filing that it received a subpoena from the SEC in October 2018 related to internal controls covering its procurement practices, yet did not reveal this information in November 2018 when it released its Q3 earnings. These issues merit more significant changes at KHC." Morgan Stanley observed in a February 22, 2019 note that although the charge was not quantitatively material, it raised serious qualitative concerns that were important to investors: "While the magnitude of the change is not material, it is concerning that there was an accounting issue, and KHC did not seem to uncover it on its own."

100.   Analysts also observed that the Company was now admitting that there were **no** cost savings to be gained through the Merger, and investors were effectively in the same place they were before the Merger occurred. Jason English of Goldman Sachs observed that, "[y]our guidance for next year suggests that the majority of the synergies you realized on consolidating Heinz and Kraft will have effectively been wiped out." Similarly, in downgrading Kraft Heinz from Overweight to Neutral in a February 22, 2019 analyst report, J.P. Morgan observed:

> If we could sum up KHC's issues in one stat it would be this: The midpoint of 2019 EBITDA guidance ($6.4B) is below what KHC printed on a pro-forma combined basis in 2014 ($6.5B). ***We thus think it is more than fair to ask if any fundamental value for KHC has been created since the Kraft Heinz merger.*** We also think that between KHC's and ABI's struggles in recent years, it is reasonable to question the entire 3G strategy. Investors for years have asked if 3G's extreme belt-tightening model ultimately would result in brand equity erosion. We think the answer arguably came yesterday in the form of a $15B (!) intangible asset write-down for the Kraft and Oscar Mayer brands.
> (underlining in original)

35

101.    A Wall Street Journal article dated February 23, 2019 pointed to a statement by Hees that "We could focus on maintaining or expanding margins, but risk forfeiting [sales] growth and market share by slowing our pace of innovation."   The article stated that these "comments are at odds with his promise to investors four years ago when Mr. Hees said he could boost the company's sales without sacrificing its profit margin."

102.    In response to this devastating news, the price of Kraft stock plummeted 27%, from $48.18 per share on February 21 to $34.95 per share on February 22, on incredibly high trading volume of over 135 million shares traded in a single day.  The disclosures on this single day erased roughly *$11.5 billion* in shareholder value.

103.    Despite these announcements, Defendants continued issuing false and misleading soothing statements to investors by saying that the economic issues facing the Company were discrete and only arose in the back half of 2018.  During the Q4 2018 earnings call on February 21, 2019, CEO Hees insisted that "[t]he core cause of our shortfall in 2018 was forecasting the pace and magnitude of our savings curve *in 2018. Not merger-related synergies and not an increase in ZBB costs*."  When Kenneth B. Goldman, a J.P. Morgan Chase analyst, asked if the issues facing Kraft Heinz, including the impairment, were related to 3G Capital's cost-cutting tactics, CFO Knopf immediately dismissed the idea: "the fundamental driver behind the reduction in expectations was driven *by our second half [2018] performance*, okay, which was primarily driven by supply chain issues that we had [on] the cost side as you know."  Goldman then followed up to confirm that the Company took such massive impairments based only on a short-term setback during the second half of 2018, noting that "companies generally don't take write-downs because recent performance was bad and because discount rates have risen. Isn't there something broader and longer term that usually

leads to these kinds of impairments?" In response, Knopf reiterated firmly that the impairments were "by far and away driven by the second half performance[.]"

### C. The Aftermath of the Company's Impairment Announcement

104.    On February 28, 2019, the Company filed a Form 12b-25 notification of late filing with the SEC. The Form 12b-25 stated that the Company would not be filing its annual Form 10K report for 2018 by the date required under SEC rules.  Kraft Heinz stated that it had been conducting a "rigorous internal investigation into the procurement area as a result" of the SEC subpoena, and that it would file its 2018 annual report when that investigation was complete.

105.    That same day, the Company also filed a Form 8-K with the SEC in which it disclosed that the $15.4 billion impairment (previously reported on February 21) broke down as follows:

| GOODWILL IMPAIRMENT ($7.1 billion) | |
|---|---|
| $4.3 billion | A 38% write-down to goodwill in Kraft Heinz's U.S. Refrigerated reporting unit within Kraft Heinz's United States segment due to revised 2019 base and future year margin expectations, primarily in the natural cheese and meats categories, and expectations for lower net sales growth in the natural and processed cheese categories. |
| $2 billion | A 50% write-down to goodwill in Kraft Heinz's Canada Retail reporting unit within Kraft Heinz's Canada segment due to lower, positive net sales growth expectations, as well as the reassessment of our Canadian operations following the announcement in November to sell certain assets in our natural cheese portfolio in Canada. |
| $315 million | A 100% write-down to goodwill in Kraft Heinz's Southeast Asia reporting unit within Kraft Heinz's Rest of World segment due to declines in the seafood and seasonal cordials categories and foreign exchange rate declines in Indonesia and Papua New Guinea. |
| $306 million | A 78% write-down to goodwill in Kraft Heinz's Northeast Asia reporting unit within Kraft Heinz's Rest of World segment due to margin and net sales declines as well as foreign exchange rate declines in Japan and Korea. |
| $207 million | A 100% write-down to goodwill in Kraft Heinz's Other Latin America reporting unit within Kraft Heinz's Rest of World segment due to net sales and margin declines in the region. |
| **$7.128 billion** | **Total non-cash impairment loss in Kraft Heinz's selling, general and administrative expenses ("SG&A") related to these five reporting units.** |

| **INDEFINITE-LIVED INTANGIBLE ASSET IMPAIRMENT ($8.4 billion)** | |
|---|---|
| $4.1 billion | A 26% write-down to the value of the *Kraft* brand, primarily due to the exit of the natural cheese category in Canada, lower net sales growth expectations in the natural cheese category in the United States, and lower net sales growth expectations in the processed cheese category in the United States and Canada. |
| $3.3 billion | A 50% write-down to the value of the *Oscar Mayer* brand, primarily due to revised 2019 base and future margin expectations in the United States. |
| $797 million | A 12% write-down to the value of the *Philadelphia* brand, primarily due to revised 2019 base and future margin expectations, and to a lesser extent, future positive growth expectations in the United States. |
| $96 million | A 4% write-down to the value of the *Velveeta* brand, primarily due to expectations for lower net sales growth. |
| $84 million | A 24% write-down to the value of the *ABC* brand, primarily due to revised expectations of future net sales growth and margins in the seafood and seasonal cordials categories in Southeast Asia as well as foreign exchange rates in the regions in which this brand is sold. |
| **$8.377 billion** | **Total non-cash impairment loss of $8.3 billion in SG&A related to these five brands.** |

106.    On April 22, 2019, Kraft Heinz announced that Miguel Patricio, a 3G Capital veteran from Anheuser Busch, would replace Defendant Hees as CEO. Patricio had acted as a Global Chief Marketing Officer for several years at Anheuser-Busch InBev. Many analysts were skeptical of another 3G Capital executive taking the helm. For example, Credit Suisse issued a report on April 22, 2019, in which the firm stated "Patricio comes to Kraft Heinz with a private equity '3G perspective,' but we think he will have a mandate to [rebuild the foundations of Kraft Heinz's marketing and financial programs.]"

107.    On Saturday, May 4, 2019, at Berkshire Hathaway's annual meeting, Warren Buffet announced that Kraft Heinz's auditor, PricewaterhouseCoopers ("PwC"), had not signed off on Kraft Heinz's annual report on Form 10-K. According to Buffett, PWC "have to explain why they haven't signed off, but they haven't signed off.... There's something going on."

38

### D. Kraft Heinz Announced a Restatement of Its Financials and a Broader SEC Investigation

108.    On May 6, 2019, Kraft Heinz reported that its previously disclosed investigation into the procurement misconduct was "substantially complete" and had revealed longstanding wrongdoing that would force the Company to restate nearly every one of its financial statements since the time of the 2015 Merger.  Of the 15 quarterly and annual reports that Kraft Heinz had filed since its creation, the Company announced its intention to restate nearly all of them, amounting to a $208 million restatement.  Specifically, on that date, Kraft Heinz filed an interim report on Form 8-K, admitting to misconduct that resulted in misstatements beginning in 2015 and announcing its decision to restate its financial statements for fiscal years 2016 and 2017, as well as the quarterly statements from 2017 and 2018.

109.    The Company explained that "as a result of the findings from the Company's investigation, which identified that several employees in the procurement area engaged in misconduct, the Company has recorded adjustments to correct prior period misstatements that increase the total cost of products sold in prior financial periods."  The Company stated further that, "[t]hese misstatements principally relate to the incorrect timing of when certain cost and rebate elements associated with complex supplier contracts and arrangements were initially recognized, and once corrected for, the Company expects to recognize corresponding decreases to costs of products sold in future financial periods." The Company disclosed that "due to the qualitative nature of the matters identified in the investigation, including ***the number of years over which the misconduct occurred and the number of transactions, suppliers, and procurement employees involved***, the Company has determined that it is appropriate to correct the misstatements in the Company's previously issued financial statements through restating such financial statements."

110.    Furthermore, the Company also disclosed that:

In connection with the internal investigation described above, the Company also conducted a comprehensive review of significant supplier contracts to identify other potential misstatements in the timing of the recognition of supplier rebates, incentive payments, and pricing arrangements. The review identified <u>additional</u> <u>misstatements,</u> which may or may not have resulted from the misconduct noted above, primarily related to certain supplier contracts and arrangements where the allocation of value of all or a portion of rebates and up-front payments to contractual elements in the current period should have been deferred and recognized over an applicable contractual period. These misstatements will be corrected for in the same manner as those noted above. The Company corrected these misstatements to defer the up-front consideration from suppliers when the retention or receipt of that consideration was contingent upon future events and to correctly recognize the consideration as a reduction of cost of products sold over the terms of the arrangements with the suppliers. The misstatements arising from the contract review relate to the timing of recognizing certain cost and rebate elements, and the Company thus expects to recognize corresponding decreases to costs of products sold in future financial periods.

111.    The Company also disclosed that, after it had issued news of the massive impairments to goodwill and intangible assets in February 2019, it had identified still further errors, this time in its calculations for goodwill and intangible asset impairments. Specifically:

[Kraft Heinz] identified errors in the allocation of forecasted cash flows to certain brands used as a basis for the interim goodwill and intangible asset impairment testing as of December 29, 2018. Correcting this allocation error led to an increase to the impairment loss initially calculated for intangible assets of approximately $278 million, which was partially offset by a reduction to the impairment loss initially calculated for the goodwill reporting units of approximately $173 million.

112.    In addition to the restatements, on May 6, 2019, Kraft Heinz also announced that the SEC was widening its investigation to probe the Company's goodwill and intangible asset assessments.  Specifically, the SEC had issued a ***second*** subpoena to focus on those areas, as well as additional requests concerning the procurement areas.

### E. Kraft Heinz Disclosed Material Weaknesses in Its Internal Controls Over Financial Reporting and a Department of Justice Investigation

113.     On June 7, 2019, Kraft Heinz filed its delayed annual report on Form 10-K for the year 2018 (the "2018 Form 10-K"), published its restated financials, and announced that it completed its internal investigation into the procurement division's accounting irregularities. In addition, Kraft Heinz announced that the DOJ had joined the investigation into the Company's accounting practices.  A spokesperson shared, "Following our earnings release and investor call on February 21, 2019, when we announced the results of our interim assessment of goodwill and intangible asset impairments, the SEC requested additional information related to our financial reporting, internal controls, and disclosures, our assessment of goodwill and intangible asset impairments, and our communications with certain shareholders.  It is our understanding that the United States Attorney's Office for the Northern District of Illinois also is reviewing this matter, working with the SEC and receiving materials from it."

114.     Kraft Heinz's 2018 Form 10-K further disclosed that the Company had discovered another material weakness in internal controls over financial reporting that affected the Company's ability to assess changes in the business environment, among other facets of the Company's operations.  Specifically, the Company disclosed

> We identified a material weakness in the risk assessment component of internal control as we did not appropriately design controls in response to the risk of misstatement due to changes in our business environment. This material weakness in risk assessment gave rise to the specific control deficiencies described below, which we also determined to be material weaknesses:
>
> - *Supplier Contracts and Related Arrangements*: We did not design and maintain effective controls over the accounting for supplier contracts and related arrangements. Specifically, certain employees in our procurement organization engaged in misconduct and circumvented controls that included withholding information or directing others to withhold information related to supplier contracts that affected the accounting for certain supplier rebates, incentives, and pricing arrangements, in an attempt

41

to influence the achievement of internal financial targets that became or were perceived to have become increasingly difficult to attain due to changes in our business environment. Additionally, in certain instances, we did not have a sufficient understanding or maintain sufficient documentation of the transaction to determine the appropriate accounting for certain cost and rebate elements and embedded leases. This material weakness resulted in misstatements that were corrected in the restatement included in this Annual Report on Form 10-K.

- *Goodwill and Indefinite-lived Intangible Asset Impairment Testing*: We did not design and maintain effective controls to reassess the level of precision used to review the impairment assessments related to goodwill and indefinite-lived intangible assets as changes in our business environment occurred. Specifically, we did not design and maintain effective controls to reassess the level of precision used in the review of the allocation of cash flow projections to certain brands used as a basis for performing our fourth quarter 2018 interim impairment assessments in response to the significant reduction in, and in certain instances elimination of, the excess fair value over carrying amount of certain brands that resulted from changes in our business environment. This material weakness did not result in a misstatement of any previously issued consolidated financial statements

115. The Company claimed that it intended to remediate these material weaknesses by the following actions:

- Personnel Actions—A comprehensive disciplinary plan is in the process of being implemented for all employees found to have engaged in misconduct, including termination, written warnings, and appropriate training depending on the severity of the misconduct.

- Performance Targets—We have identified and will be implementing several performance-based target enhancements as follows: (i) implementing checkpoints to evaluate significant changes in the environment that could adversely impact the attainability of management goals and targets; (ii) reassessing and adjusting the overall balance of performance measures provided to employees to help drive challenging but attainable targets; and (iii) enhancing our training and overall communication specific to the Management by Objective ("MBO") process, including a focus on the process to request relief from previously established MBOs, to help ensure all eligible employees are aware of and understand the overall MBO waiver and relief process; (iv) reinforcing the importance of adherence to established internal controls and company policies and procedures through other formal communications, town hall meetings, and other employee trainings; and (v) reassessing certain employees' key performance indicators.

- Organizational Enhancements—We have identified and are in the process of implementing organizational enhancements as follows: (i) augmenting our procurement finance teams with additional professionals with the appropriate levels of accounting and controls knowledge, experience, and training in the area of supplier contracts and related arrangements; and (ii) realigning reporting lines whereby procurement finance now report directly to the finance organization.

- Procurement Practices—We have evaluated our procurement practices and are in the process of implementing improvements to those practices, including: (i) developing more comprehensive contract approval policies and processes; (ii) enhancing required communication protocols among all functions involved in the procurement process (e.g., procurement, legal, accounting, and finance) to ensure all relevant parties are involved in the contract review process; (iii) standardizing contract documentation and analyses; and (iv) developing a more comprehensive accounting review process and monitoring controls over supplier contracts and related arrangements to ensure transactions are recorded in accordance with generally accepted accounting principles.

- Training Practices—We are in the process of developing a comprehensive global procurement training program that will cover supplier contracts and related arrangements, including potential accounting implications. As part of this effort, we have held mandatory training for our global procurement function, which focused on our policies and procedures related to procurement, including the proper accounting for the contract terms that contributed to the material weakness.

- Procurement Management Software—We have started to evaluate potential solutions to implement or upgrade the existing procurement management software to enhance the identification, tracking, and monitoring of supplier contracts and related arrangements.

- Level of Precision Applied to Impairment Testing—We are in the process of implementing a plan to enhance the level of precision at which our internal controls over financial reporting relating to goodwill and indefinite-lived intangible asset impairment assessments are performed. Specifically, we will be implementing and executing additional procedures to (i) enhance our analysis of forecasted cash flows used in the impairment assessment and (ii) test the accuracy of forecasted cash flow allocations to specific brands

### F. Kraft Heinz Disclosed the Need for Substantial Reinvestment in Its Brands and Operations

116. On August 8, 2019, Kraft Heinz announced preliminary results for the first half of 2019, including additional significant sales and earnings misses, and an additional $1.2 billion goodwill impairment. During the Company's earnings call that same day, Kraft Heinz's new CEO, Miguel Patricio, acknowledged that the Company could no longer sustain its margins through additional cost-cutting and needed to invest aggressively in both its supply chain and its brands going forward in order to remain competitive. Patricio stated that the Company's profitability had been impacted by its need to make additional "stepped-up fixed cost investments" as well as even more price cuts to support its failing brands. Kraft Heinz stated that its $1.2 billion goodwill impairment reflected the Company's reduced profitability, given its higher costs and investment needs. Kraft Heinz also withdrew its 2019 guidance, which Patricio acknowledged was "a big disappointment" to some analysts.

117. Importantly, on the Company's August 8, 2019 earnings call, Patricio acknowledged the validity of concerns about the sustainability of Kraft Heinz's model that Defendants had previously misleadingly denied. Patricio admitted that he "shared many of the concerns that a good number of you have expressed over things like brand support, supply chain execution, the sustainability of our profits." Indeed, Patricio acknowledged that far from extracting cost savings through improved efficiencies that led to sustainable margin expansion, "[m]aybe because of all the complexity that we put in the system, *supply chain losses have been increasing, actually, double digits in the last years.*" Moreover, Patricio admitted that rather than have significant additional runway to "accelerate" the Company's "savings initiatives" that it would be "hard [for Kraft Heinz] to continue cutting costs" and that Kraft Heinz would have to "change the strategy," focusing, "[n]ot on cost cutting, but on efficiencies . . . making our execution in sales much better, making our

44

market investments . . . much better." In other words, Patricio acknowledged that Kraft Heinz would have to undergo a radical pivot in strategy that, contrary to Defendants' prior misstatements, would require significant reinvestment going forward. Patricio further acknowledged that this had long been evident to Kraft Heinz, admitting, that the Company "persisted with integration-minded cost-cutting and did not pivot to a continuous-improvement productivity-driven mindset soon enough." Analysts specifically pointed out that Kraft Heinz was acknowledging for the first time that "some reinvestment [in supply chain] is needed . . . not just that the savings are not there as the company stated last year [on November 1, 2018."

118. Analysts immediately revised their valuation of Kraft Heinz downward in response to the Company's August 8, 2019 disclosures, highlighting the Company's admissions that its so-called "cost savings" had not driven efficiencies, as Defendants had misleadingly stated, but had impaired the Company's core operations. For instance, the Company's disclosures caused Piper Jaffray analysts to question, in an August 8, 2019 report, "How sustainable are above-peer margins[.]" The analysts lowered their price target for Kraft Heinz stock and stated that "[w]e remain cautious on [Kraft Heinz's] outlook due to risks from higher spending levels and a potentially slow and/or costly path to sustainable top-line growth," noting that "pre-merger type margins may be needed to accompany" the Company's reinvestment efforts.

119. In an August 9, 2019 report, Barclays analysts also lowered their price target for Kraft Heinz stock and highlighted the Company's acknowledgement that it was out of room to cut costs to sustain margin, that its "cost-cutting" had not generated efficiencies, and that reinvestment would be required for Kraft Heinz to maintain a sustainable business: "CEO Patricio spent considerable time calling for KHC to move from a focus on deal related cost savings to more of an ongoing productivity and efficiency model. ***In our view, KHC was rather candid that it pushed***

*the cost cutting lever too hard and must reduce costs in a 'different way.'* Interestingly, to us, this harkens back to Kraft's strategy under then CEO Tony Vernon (pre-3G Capital)." These analysts repeated Patricio's acknowledgment that rather than extracting efficiencies that would sustain margin, Kraft Heinz management had left the Company's supply chain in shambles: "we believe complexity in KHC's supply chain has led to some losses (i.e. produce losses, system waste, etc.) which could represent hundreds of millions in reinvestment funds." Moreover, these analysts noted that "CEO Patricio flatly proclaimed media investment behind core brands and innovation is low." Wolfe Research analysts similarly stated in their August 8, 2019 report that "it appears to us that turning around KHC is likely to take multiple years of operational investment in areas such as supply chain as well as brand investment in order to return to growth."

120.    On August 9, 2019, Evercore analysts likewise reported that "Following 4Q18, the company said that a failure to deliver supply chain savings was the biggest contributor to the 2H18 EBITDA shortfall. Patricio believes that part of this was driven by persistent 'integration-minded cost cutting' rather than a more healthy productivity-driven approach." These analysts also highlighted the "[a]dditional delay in 10-Q filings for Q1 and Q2[, which] also limits transparency regarding near-term cash flow dynamics as the accounting and procurement investigations remain ongoing." Finally in an August 9, 2019 report, Guggenheim analysts stated, "*Investment needed after years of cutting too deep. Patricio admitted that the repetition of cost cutting efforts over the past several years has been ineffective at turning around the business and that as a result, the core brands will now require significant reinvestment.*" These analysts concluded, "the company finds itself in a precarious situation where 1) the balance sheet is constrained by a high debt burden, 2) the brands are in dire need of heavy investment, 3) the organization needs to be re-

energized [i.e., supply chain will have to be rebuilt], and 4) the cash flow isn't sufficient to fund all those urgencies concurrently."

121.    In response to the Company's August 8, 2019 disclosures, Kraft Heinz stock declined more than 14%, falling from $30.87 per share at the market close on August 7, 2019 to $26.50 per share on August 9, 2019, on high volume.

### G.  Additional Developments

122.    On August 26, 2019, the Company announced that Patricio had made the "strategic decision" to remove Knopf as CFO and replace him with "seasoned veteran," Defendant Basilio. Basilio had been Kraft Heinz's CFO from the closing of the Merger through October 2017.  Since 2017, when Knopf took the role of CFO, Basilio had acted as President of the U.S. Commercial Business and, since July 2019, he had served as Chief Business Planning and Development Officer. Knopf would return to 3G Capital.

123.    On September 3, 2019, new CEO Patricio held a group meeting with analysts to discuss his operating vision and his impressions of Kraft Heinz.  As set forth in September 3, 2019 notes by Barclays and Credit Suisse, Patricio stated during the meeting that *supply chain losses had been increasing 15% year-over-year since the 2015 Merger*.

## VII.    ADDITIONAL SCIENTER ALLEGATIONS

124.    The following allegations, taken holistically with those set forth above, permit a strong inference of Defendants' scienter.  *First*, the magnitude and timing of Kraft Heinz's more than $15 billion writedown of goodwill and intangible assets yields a strong inference that the impairment was not the product of a sudden, unexpected, or short-term disruption in Kraft Heinz's business or a mere forecasting error, but rather, as analysts concluded, that "the bad news was optically pushed forward [by Defendants] long enough such that the company was forced to reset

47

the bar." Kraft Heinz's impairment charge is the largest write-down in the U.S. consumer staples industry, and the seventh largest taken by any public company in at least a decade. Indeed, as Duff & Phelps analysts explained, Kraft Heinz's $7 billion "goodwill impairment alone is greater than that entire sector over the last three years." Analysts called the write-down "staggering," "one of the largest writedowns in corporate history," and a "mega-impairment." Given its size, analysts attributed the write-down to long-term conditions affecting Kraft Heinz's core operations that could not have reasonably escaped management's notice; specifically, analysts concluded the write-down showed that Kraft Heinz's cost-cutting measures had not been aimed at achieving synergies and efficiencies that would drive sustainable growth, as Defendants had claimed, but rather implemented a "slash and burn" approach that left the Company's infrastructure in shambles. As discussed above, for example, Piper Jaffray analysts concluded that the magnitude of the restatement "validate[d] fears" that Kraft Heinz had "been more focused on costs than building brand equity." Likewise, Credit Suisse analysts reported, "Anecdotal comments we hear from employees who left the company (and some who are still there) consistently point to a corporate culture that is sweating its assets too hard." J.P. Morgan analysts similarly questioned whether "any fundamental value for Kraft Heinz has been created since the Kraft Heinz merger."

125. Current CEO Patricio would eventually admit that some of the main drivers behind the goodwill impairment were themselves significant in size, implying a strong inference of scienter. On the second quarter 2019 earnings call held on August 8, 2019, Patricio noted that "our supply chain losses have been increasing, actually, double digits in the last years." Consistent double-digit losses in the Company's supply chain, which significantly connected to multiple levels of Kraft Heinz's business, would have been massively impactful. The magnitude of such a loss strongly suggests that Defendants knew of the damage of the past years to the Company's

48

supply chain or recklessly disregarded the signs of the damage. That Patricio himself became aware of this trend so shortly after becoming CEO, strongly suggests the trend was readily apparent and Hees and the other Individual Defendants were aware of the mounting losses prior to Patricio's elevation to his new role.

126. Moreover, Kraft Heinz announced its massive write-down outside of its scheduled second quarter impairment testing and only after the SEC initiated an investigation into the very areas of the Company's business that drove the impairment—its supply chain and procurement functions. As discussed above, as part of that ongoing investigation, Kraft Heinz admitted that it had deliberately misstated previously reported financial results by understating its procurement costs. The timing of Kraft Heinz's write-down suggests that it was motivated by regulators' investigation into Company wrongdoing, rather than a sudden desire to retest the Company's goodwill outside of Kraft Heinz's routine schedule for doing so.

127. Thus, both the magnitude and timing of the Company's write-down, as well as the magnitude of the underlying causes of the write-down, support a strong inference of scienter.

128. **_Second_**, Defendants' false and misleading statements concerned the most significant events, initiatives, and issues in Kraft Heinz's business, including the Company's ability to support top-line growth while sustainably cutting costs, supports a strong inference of scienter. Defendants focused intensely on developing $1.5 billion in integration savings built on finding synergies and efficiencies between Kraft and Heinz. Defendants promoted these integration savings immediately after announcing the Merger and continued providing the market with consistent updates on the status of these savings on every earnings call. Analysts likewise monitored the Company's success against the established benchmark set by the integration program, consistently updating the market on Kraft Heinz's progress on their quarterly reports. In

fact, Defendants publicly identified, as one of the Company's core strategies and competencies, its ability to generate top-line growth while pursuing sustainable cost-cutting.

129.     Defendants admitted on August 10, 2015 that they had contemplated cost savings initiatives even prior to the Merger.  Defendants made the importance of synergistic supply chain utilization clear during the earliest days of Kraft Heinz.  During Kraft Heinz's first earnings call, on November 6, 2015, Defendant Hees started by discussing senior management's "extensive review of our combined North America supply chain and manufacturing footprint, capabilities and capacity utilization."  The resulting integration plan would become a fixture of subsequent earnings calls.

130.     These issues were also the subject of numerous analyst questions and frequently addressed by Defendants on Kraft Heinz's earnings calls.  Defendants frequently touted Kraft Heinz's "sustainable improvements," and "sustainable, profitable growth, while promising that the Company could achieve "savings without sacrificing quality."  Analysts likewise responded when Defendants focused on sustainability, noting that "KHC continues to create *a sustainable EBITDA growth algorithm,*" and, "the key tenet of Kraft Heinz's strategic focus *has been driving efficiencies within its operations*."  The issue of sustainability became a constant refrain in the dialogue between Defendants and analysts.

131.     Defendants' misstatements concerning Kraft Heinz's sustainable cost cutting and synergies clearly referenced a critically important aspect of the Company and were a keen focus of both Defendants and analysts, which supports a strong inference of scienter.

132.     *Third*, the departure of key, senior personnel as Defendants' fraud unraveled strengthens the inference of Defendants' scienter.  Defendant Hees' and Knopf's departures occurred less than two months before Patricio's first public statements to investors, where he

50

further revealed the extent of Defendants' fraud. Executive Vice President of Global Operations and head of supply chain and procurement, Eduardo Pelleissone, who oversaw the Company's procurement while the accounting fraud was occurring, quietly transitioned into an ill-defined role in early November 2018 and then left the Company in June of 2019. These key individuals were all directly connected with the Company's false and misleading statements and left after the truth about Kraft Heinz emerged or just before the full extent of their false and misleading statements was revealed.

## VIII. PRESUMPTION OF RELIANCE

133.   At all relevant times, the market for Kraft Heinz's securities was efficient for the following reasons, among others:

(a) Kraft Heinz's stock met the requirements for listing, and was listed and actively traded on the Nasdaq, a highly efficient market;

(b) The public documents Kraft Heinz issued in connection with the Merger were filed with the SEC;

(c) Kraft Heinz regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) Kraft Heinz was followed by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to those brokerage firms' sales forces and certain customers. Each of these reports was publicly available and entered the public marketplace.

134.   As a result of the foregoing, the market for Kraft Heinz stock promptly digested current information regarding Kraft Heinz from all publicly available sources and reflected such information in Kraft Heinz's stock price. Under these circumstances, purchasers of Kraft Heinz common stock and call options at artificially inflated prices, and sellers of put options at artificially

deflated prices, during the Class Period suffered similar injury through their transactions and a presumption of reliance applies.

135.    In addition, Plaintiff is entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the claims asserted herein are predicated in part upon material omissions of fact that Defendants had a duty to disclose.

## IX.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

136.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements described in this Complaint. Many of the specific statements described herein were not identified as "forward-looking" when made. To the extent that there were any forward-looking statements, there was no meaningful cautionary language identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements described herein, Defendants are liable for those false forward-looking statements because at the time each was made, the particular speaker knew that the particular forward-looking statement was false or misleading, and/or that the forward-looking statement was authorized and/or approved by an executive officer of Kraft Heinz who knew that those statements were false or misleading when made.

## X.    CLASS ACTION ALLEGATIONS

137.    Plaintiff brings this action as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3) on behalf of a Class consisting of all those who purchased or otherwise acquired Kraft Heinz common shares, call options, or put options between July 2, 2015 and November 4, 2015, inclusive, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants,

the officers and directors of Kraft Heinz at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

138.   The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Kraft Heinz common shares were actively traded on the Nasdaq.  As of February 8, 2020, Kraft Heinz had 1,221,399,549 shares of common stock outstanding.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members of the proposed Class.  Class members who purchased Kraft Heinz common shares may be identified from records maintained by Kraft Heinz or its transfer agent(s), and may be notified of this class action using a form of notice similar to that customarily used in securities class actions.

139.   Plaintiff's claims are typical of Class members' claims, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

140.   Plaintiff will fairly and adequately protect Class members' interests and have retained competent counsel experienced in class actions and securities litigation.

141.   Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members.  Among the questions of fact and law common to the Class are:

      (a)  whether the federal securities laws were violated by Defendants' acts as alleged herein;

      (b)  whether statements made by Defendants to the investing public prior to and during the Class Period misrepresented material facts about Kraft Heinz;

(c) whether Defendants acted with scienter; and

(d) to what extent the members of the Class have suffered damages, as well as the proper measure of damages.

142.    A class action is superior to all other available methods for the fair and efficient adjudication of this action because joinder of all Class members is impracticable.  Additionally, the damage suffered by some individual Class members may be relatively small so that the burden and expense of individual litigation makes it impossible for such members to individually redress the wrong done to them.  There will be no difficulty in the management of this action as a class action.

## XI.    CLAIMS FOR RELIEF

### COUNT I
### FOR VIOLATIONS OF SECTION 10(B) OF THE EXCHANGE ACT AND SEC RULE 10B-5 PROMULGATED THEREUNDER
### (AGAINST KRAFT HEINZ AND THE INDIVIDUAL DEFENDANTS)

143.    Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

144.    This Count is asserted on behalf of all members of the Class against Defendant Kraft Heinz and the Individual Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

145.    Defendant Kraft Heinz and the Individual Defendants disseminated or approved the false statements specified below, among others, which Defendant Kraft Heinz and the Individual Defendants knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

146.    Defendant Kraft Heinz and the Individual Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Kraft Heinz common stock and options during the Class Period.    As detailed herein, the misrepresentations contained in, or the material facts omitted from, those statements included, but were not limited to: misleading statements concealing that Kraft Heinz's cost-cutting measures had severely impaired the Company's supply chain and brand value; misleading statements concealing that Kraft Heinz's cost reductions were not synergistic, efficiency-generating, or sustainable, but were instead brute force cost cuts that impaired core business functions; misleading statements purporting to accurately report Kraft Heinz's financial results; misleading statements reassuring investors about the integrity of Kraft Heinz's internal controls and the robustness of its goodwill impairment testing.

147.    Defendant Kraft Heinz and the Individual Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in an continuous course of conduct that operated as a fraud and deceit upon Plaintiff and the Class; made various untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with a severely reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of Kraft Heinz common shares,

call options, or put options, which were intended to, and did: (a) deceive the investing public, including Plaintiff and the Class, regarding, among other things, the sustainability of Kraft Heinz's cost-cutting measures, Kraft Heinz's engagement in accounting fraud to mask its financial struggles, and the Company's materially inadequate internal controls over its financial reporting; (b) artificially inflate and maintain the market price of Kraft Heinz common stock and call options and artificially deflate the price of Kraft Heinz put options; and (c) cause Plaintiff and other members of the Class to purchase Kraft Heinz common stock and/or call options at artificially inflated prices, or write put options at artificially deflated prices, and suffer losses when the true facts became known.

148.    As described above, Defendant Kraft Heinz and the Individual Defendants acted with scienter throughout the Class Period, in that they either had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them.

149.    Plaintiff and the Class have suffered damages that, in direct reliance on the integrity of the market, they paid artificially inflated prices for Kraft Heinz common stock, which artificial inflation was removed from the stock when the true facts became known.  Plaintiff and the Class would not have transacted in Kraft Heinz common stock or options at the prices paid, or at all, if they had been aware that the market price of Kraft Heinz common stock and call options had been artificially inflated, and the price of Kraft Heinz put options artificially deflated, by Defendant Kraft Heinz and the Individual Defendants' false and misleading statements.

150.    As a direct and proximate result of Defendant Kraft Heinz's and the Individual Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages

attributable to the fraud alleged herein in connection with their purchases of Kraft Heinz common shares, call options, or put options during the Class Period.

## COUNT II
### FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT
### (AGAINST 3G CAPITAL AND THE INDIVIDUAL DEFENDANTS)

151.    Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

152.    This Count is asserted on behalf of all members of the Class against Defendant 3G Capital and the Individual Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

153.    As alleged in detail above, throughout the Class Period, 3G Capital was a controlling person of the Company within the meaning of Section 20(a) of the Exchange Act.  By reason of its voting power, ownership, rights as against Kraft Heinz, and/or specific acts, 3G Capital had the power to control Kraft Heinz's operations and its decision-making processes. Specifically, (i) throughout the Class Period, 3G Capital maintained a controlling interest in both Kraft Heinz's common stock and in its voting securities; (ii) 3G Capital had the power to appoint, and did appoint, a majority of the Board's directors, which included Defendant Behring, Jorge Paolo Lemann, and Marcel Hermann Telles, who co-founded 3G Capital and served as senior personnel partners; (iii) 3G Capital hand-picked Kraft Heinz's senior executive team, including the Individual Defendants, who were senior personnel at 3G Capital; (iv) 3G Capital had the power to cause Kraft Heinz to register and offer securities for sale to the public.

154.    3G Capital exercised its control over Kraft Heinz to cause the Company to issue public statements including issuing the false and misleading 2015, 2016 and 2017 Forms 10-K, which were all signed by 3G Capitals's representatives on the Kraft Heinz Board.

155.     As alleged above, in its public filings during the Class Period, Kraft Heinz readily acknowledged 3G Capital's power to control the Company's operations and decision-making process.   Among other things, Kraft Heinz acknowledged that 3G Capital, as part of the "Sponsors," "*have substantial control over us* and may have conflicts of interest with us in the future."

156.     During their tenures as officers and/or directors of Kraft Heinz, each of the Individual Defendants was a controlling person of the Company within the meaning of Section 20(a) of the Exchange Act.  By reason of their positions of control and authority as officers and/or directors of Kraft Heinz, these Defendants had the power and authority to direct the management and activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein.

157.     As more fully described above, in their capacities as senior corporate officers of the Company, the Individual Defendants had direct involvement in the day-to-day operations of the Company, including their power to control or influence the policies and practices giving rise to Kraft Heinz's misleading statements about its destructive cost-cutting measures, inaccurate financial results reports, and inadequate internal controls, alleged herein, and exercised the same. The Individual Defendants made numerous false and misleading statements on Kraft Heinz's behalf at investor conferences, in SEC filings, and on earnings calls.

158.     Defendants Hees and Basilio signed the Company's SEC filings during the Class Period.  Defendants Hees and Basilio also signed the Registration Statement issued in connection with the merger of Kraft and Heinz.   The Individual Defendants were directly involved in disseminating Kraft Heinz's false and misleading statements during the Class Period. Each of the Individual Defendants owned Kraft Heinz stock during the Class Period.   As a result of the

foregoing, the Individual Defendants, as a group and individually, were controlling persons of Kraft Heinz within the meaning of Section 20(a) of the Exchange Act.

159.    Kraft Heinz violated Section 10(b) of the Exchange Act by its acts and omissions, as alleged in this Complaint. By virtue of their positions as controlling persons of Kraft Heinz, 3G Capital and the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally to Plaintiff and the other members of the Class who purchased or otherwise acquired Kraft Heinz securities.

160.    As a direct and proximate result of 3G Capital's and the Individual Defendants' conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchase or acquisition of Kraft Heinz securities.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

a.    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

b.    Awarding compensatory damages and equitable relief in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

d.    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury.

Dated: March 25, 2020                        Respectfully Submitted,

**GRANT & EISENHOFER P.A.**

By: */s/Deborah A. Elman*
Deborah A. Elman (# 4305264)
Daniel L. Berger (*pro hac vice* application
forthcoming)
Caitlin M. Moyna (*pro hac vice* application
forthcoming)
485 Lexington Avenue
29th Floor
New York, NY 10017
phone: +1 646 722 8500
fax: +1 646 722 8501
dberger@gelaw.com
cmoyna@gelaw.com

Karyn L. Bass Ehler (# 6285713)
30 N. LaSalle Street
Suite 2350
Chicago, IL 60602
phone: +1 312 610 5350
fax: +1 312 214 0001
kbassehler@gelaw.com